

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
Northern District of Texas
FILED

CLERK, U.S. DISTRICT COURT
By _____
          Deputy

| | | |
|---|---|---|
| GW EQUITY LLC, GWBS, INC. AND GREAT WESTERN BUSINESS SERVICES, LLC. | § § § § | |
| PLAINTIFFS, | § § § | |
| V. | § § § | CAUSE NO. 3-05CV0800-R |
| PBS GLOBAL, INC. F/K/A PRUDENTIAL BUSINESS SERVICES INC., JOHN PERSAUD, RICHARD MEIER, LAHNY McCRAY DALE GRANGER, JOSEPH C. KISER, WAYNE LEE, WILLIAM JACOBS, FRED RODDA, AND STEPHANIE KRAFT. | § § § § § § § § § § | |
| DEFENDANTS. | § § | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS PBS, GRANGER, JACOBS AND RODDA'S MOTION TO DISMISS**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs Great Western Business Services, LLC , GW Equity LLC ("GWE") and GWBS, Inc. (collectively "GWBS") file this Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss and would respectfully show the Court as follows:

I.

**PRELIMINARY STATEMENT**

Defendants PBS, Granger, Jacobs and Rodda seek to have this Court dismiss the entire suit on grounds of a lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) based solely on an arbitration provision in the Independent

Dockets.Justia.com

Contractor Agreements executed by many of the individual defendants and Plaintiffs. Defendant PBS' argument is totally unfounded and not based on any authority whatsoever because there is no agreement containing an arbitration provision between it and Plaintiffs. With respect to Granger, Jacobs and Rodda, Defendants' argument ignores Plaintiffs' other statutory and common law causes of action, including tortious interference, misappropriation of trade secrets, misappropriation of confidential information and civil RICO claims, which are not covered by any agreed arbitration provision and for which Plaintiffs' also seek injunctive relief. These statutory and common law claims are not governed by any arbitration agreement and are well within the jurisdiction of the Court.

Further, Defendants' argument fails to take into account another provision in the contract which clearly authorizes injunctive relief for violations of the contract involving irreparable harm. Plaintiffs concede that any <u>request for damages</u> based on breach of the contracts is subject to mandatory arbitration. However, the contract authorizes injunctive relief separate and apart from the arbitration provision for violations which would cause irreparable harm.

Finally, Defendants' motion is procedurally improper. Even if the Court finds certain causes of action subject to arbitration by agreement, the proper motion is to compel arbitration and stay the current proceedings pending arbitration, not dismissal.

## II.

## BACKGROUND

Plaintiff filed its application for TRO, and preliminary injunction on April 22, 2005. This Court granted Plaintiffs' request for TRO on April 27, 2005, which expired on May 16, 2005. The Court extended the TRO until June 1, 2005, by an order signed on May 17,

2005.  The Court vacated the TRO signed on May 17, 2005 as to certain defendants on May 19, 2005. On that same day Defendants PBS, Granger, Jacobs and Rodda filed a motion to dismiss for lack of subject matter jurisdiction.

III.

ARGUMENT

## A. The Arbitration Clause Does not Apply to Plaintiffs' Other Statutory and Common Law  Claims Against PBS and the Individual Defendants

There is no contractual or other authority to require Plaintiffs to arbitrate their claims against PBS or their other common law and statutory claims against the individual defendants.    *See* 9 U.S.C. § 2; *Texaco Exploration and Production Co. v. AmClyde Engineered Prods. Co.*, 243 F.3d 906 (5th Cir. 2001) (no application absent agreement to arbitrate). Yet, Defendants seek to dismiss the entire case filed by Plaintiffs based **solely** on an arbitration provision in many of the independent contractor agreements between Plaintiffs and the Individual Defendants.  Defendants completely ignore, however, Plaintiffs common law and statutory claims for which the TRO and preliminary injunction are also sought and for which no arbitration provision applies.

Before issuing an order compelling arbitration, the Court must first determine whether the parties agreed to arbitrate. *Mitsubishi Motors Corp. v. Soler Chryslery-Plymouth,* 473 U.S. 614, 626 (1985).   This involves a two-step analysis:  (1) whether there is an agreement to arbitrate between the parties and (2) whether the dispute in question falls within the scope of the agreement. *Webb v. Investacorp,* 89 F.3d 252, 258 (5th Cir. 1996).

### 1. *There is no Agreement to Arbitrate Between PBS and Plaintiffs.*

PBS' motion to dismiss is totally unfounded and without any authority whatsoever. PBS cannot even meet the first prong of the analysis because there is no agreement between

PBS and Plaintiffs.   Plaintiffs have made no allegations, in their Complaint or otherwise, against PBS for breach of contract, as PBS and GWBS never entered into any contractual agreements.    Rather, Plaintiffs seeks to enjoin PBS from its tortious interference, misappropriation of trade secrets and other common law causes of action alleged in the Complaint, as well as from further RICO violations.   Thus, there is no arbitration provision applicable to PBS and the claims against it should not be dismissed as they are well within the jurisdiction of this Court and not subject to an agreement to arbitrate.  9 U.S.C. § 2.

2. ***Plaintiffs' Other Common Law and Statutory Claims Against Defendants Granger, Rodda and Jacobs are Not within the Scope of Arbitration***

Although claims seeking damages for breach of contract would be subject to the arbitration clause, there is no authority, contractual or otherwise, to require Plaintiffs to arbitrate their other common law and statutory claims against the individual defendants. *See* 9 U.S.C. § 2; *Texaco Exploration and Production Co. v. AmClyde Engineered Prods. Co.*, 243 F.3d 906 (5th Cir. 2001) (no application absent agreement to arbitrate).

The individual defendants cannot meet the second prong of the arbitration analysis— whether the dispute is within the scope of the arbitration provision. *Webb v. Investacorp*, 89 F.3d 252, 258 (5th Cir. 1996).  The contracts containing arbitration agreements limit mandatory arbitration to claims arising from the contract or the breach thereof.   Plaintiffs seek to enjoin the individual Defendants from not only breaching their independent contractor agreements, but from tortiously interfering with Plaintiff's prospective and actual business contracts and actual and prospective business relationships, misappropriating Plaintiff's trade secrets, from further theft of Plaintiffs' confidential and proprietary information, and civil RICO violations, among other things.  As is the case with respect to all claims against PBS, Plaintiffs' other common law and statutory claims against the

individual defendants do not implicate any arbitration provision and should not be dismissed because they are well within the jurisdiction of the Court as alleged in Plaintiffs' Original and First Amended Complaints.

## B. The Contracts at Issue Provide for Injunctive Relief Separate and Apart from Those Claims for Damages Which are Subject to Arbitration

Plaintiffs' concede that any action seeking **damages** for breach of the independent contractor agreements is subject to Arbitration under the respective contracts which contain such a provision. However, in such contracts, a separate provision governs claims for injunctive relief. The injunctive claims are not subject to the mandatory arbitration provision and are specifically carved out of that section in the agreement, as Defendants acknowledge in their brief. (Defendants Motion at 4.) Copies of the various Independent Contractor Agreements are attached hereto as Ex. A.[1]

If this Court finds that requests for injunctive relief based on Plaintiffs' claims for breach of contract are within the Arbitration clause set forth in many of the independent contractor agreements between the Individual Defendants and Plaintiffs', this Court should compel arbitration for only those claims for breach of contract involving the Defendants whose contracts contain arbitration provisions. Specifically, it has come to Plaintiffs' attention that the contracts involving Fred Rodda and John Persaud attached hereto as Ex. A, do not contain Dispute Resolution (arbitration) provisions and, thus, are not subject to arbitration.

Further, as previously discussed above, Plaintiffs' other common law and statutory claims should not be dismissed. As is the case with respect to all claims against PBS and the

---

1 Although Defendants allege that none of the Independent Contractor Agreements have been filed with the Court, Plaintiffs initially filed an agreement containing provisions representative of the covenants the Individual Defendants violated . However, due to the immediacy of the need to curb Defendants' conduct, Plaintiff could not produce all of the respective agreements. Plaintiffs have attached all of the Agreements that have currently been located to its

other common law and statutory claims against the individual defendants, there is no authority to dismiss based on a contractual arbitration provision which only covers claim arising out of the contract.

## C. Proper Motion is to Compel Arbitration, Not Dismiss Claims

Defendants seek to dismiss all claims filed against them by Plaintiffs. The proper procedure, however, is to stay the trial on claims subject to arbitration pending arbitration, rather than dismiss such claims. 9 U.S.C. § 3; *Texaco Exploration and Production Co. v. AmClyde Engineered Prods. Co.*, 243 F.3d 906 (5th Cir. 2001); *Bender v A.G. Edwards & Sons, Inc.*, 971 F2d 698 (11th Cir. 1992) (Upon finding that claim is subject to arbitration, court should order stay rather than dismissal).

## D. This Court Should Grant Plaintiffs' Request for Preliminary Injunction

As Defendants addressed the Preliminary Injunction in their motion to dismiss, Plaintiffs will respond to the allegations in it as well. Plaintiffs, however, have filed a memorandum in support of preliminary injunction with the Court, which has been served on all parties.

Contrary to Defendants assertions that "Plaintiffs' made no attempt to provide notice of the TRO, either by phone or mail, to any of the Defendants," Defendants sent out via certified mail, return receipt requested, copies of the summons, complaint, proposed TRO, Certificate of Interested Persons, Civil Cover Sheet and Proposed Order Accepting Temporary Restraining Order Bond Money Into the Registry of the court on April 26, 2005. In addition, the process servers for each of the 10 defendants served a copy of all the

---

memorandum in support of preliminary injunction.. These contracts are also attached hereto as Ex. A.

foregoing documents to each defendant. Further, On May 5, 2005, another copy of the TRO and Proposed Order Accepting Temporary Restraining Order Bond Money Into the Registry of the Court was mailed certified mail, return receipt requested to each of the defendants. The order granting the TRO was not signed until April, 27, 2005.

Furthermore, Plaintiffs informed the Court in its Complaint why notice should not be required as required by Fed. R. Civ. P. 65. Specifically, Plaintiffs' Complaint at paragraph 74 states "The Court should enter this temporary restraining order without notice to the Defendants because Defendants continue in their efforts to steal Plaintiffs' confidential and proprietary information and Plaintiffs will suffer immediate and irreparable injury if the TRO is not granted before the opposing party can be heard. Furthermore, based on the foregoing statements regarding Defendants' actions, there is a substantial risk that Defendants would destroy or conceal evidence if notice is given." Thus, GWBS attempted to notify Defendants prior to issuance of the TRO and further informed the Court why such notice should not be required. *See Adobe Sys. v South Sun Prods., Inc.,* 187 F.R.D. 636 (S.D. Cal. 1999) (Ex parte relief under FRCP 65(d) is generally confined to two situations; first, plaintiff may obtain ex parte relief by showing that it is impossible to give notice to adverse party because plaintiff does not know party's identity or location, and second, is by showing that proceeding ex parte is sole method of preserving state of affairs in which court can provide effective final relief).

## IV.

## CONCLUSION

Defendants PBS, Granger, Jacobs and Rodda seek to have this Court dismiss the entire suit against them on grounds of a lack of subject matter jurisdiction pursuant to

Federal Rule of Civil Procedure 12(b)(1) based solely on an arbitration provision in the Independent Contractor Agreements executed by many of the individual defendants and Plaintiffs.   First and most importantly, Plaintiffs have made no allegations that PBS breached any contract between it and GWBS, as no contracts between those two entities exist. Thus, there is simply no basis to compel arbitration based on a contractual provision. Further, Defendants argument fails to recognize Plaintiffs other common law and statutory causes of action against the individual Defendants which are outside the scope of the arbitration provisions in many of the independent contractor agreements.  If the Court finds Plaintiffs' breach of contract claims seeking injunctive relief are subject to the arbitration provisions, the proper procedure is to stay the trial of those claims pending arbitration, not dismissal.  For the foregoing reasons, Plaintiffs Request Defendants PBS, Granger, Jacobs and Rodda's Motion to Dismiss be denied and the Preliminary Injunction hearing remain set for June 1, 2005 at 10:00 a.m. or at a time when all parties have been served.

Respectfully submitted,

MCCREARY & STOCKFORD, L.P.
18383 Preston Road, Suite 150
Dallas, Texas  75252-5476
214.291.0800 (Telephone)
214.291.0801 (Facsimile)

David S. McCreary
Texas Bar No. 00789477
Cory S. Hartsfield
Texas Bar No. 24038943

ATTORNEYS FOR PLAINTIFFS
GREAT WESTERN BUSINESS
SERVICES, LLC, GW EQUITY AND
GWBS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been sent to the following, via certified mail, return receipt requested this _____ day of May, 2005.

Richard Meier
10501 Old Bridge Lane
Charlotte, North Carolina 28269

Lahny McCray
887 Ox Yoke Road
Grants Pass, Oregon 97526-9729

Joseph Kiser
3798 Laurel Branch Rd NW
Floyd, VA 24091

Wayne Lee
6900 Incas Drive
Little Rock, Arkansas 72116

John Persaud
5025 High Point Dr.
Pensacola, Florida 32505

Stephanie Kraft
5114 36th Avenue Drive West
Bradenton, Florida 34201

Stuart Alexander III
Tilford, Dobbins, Alexander Buckway
& Black LLP
401 West Main Street, Ste. 1400
Louisville, Kentucky 40202
Counsel for Defendants Rodda, PBS,
Granger and Jacobs

Molly Steele
Thompson & Knight
1700 Pacific, Ste. 3300
Dallas, Texas 75201
Counsel for Defendants Rodda, PBS,
Granger and Jacobs

_____
Cory S. Hadsfield

## FIAT

A hearing on Movant's Motion to Dismiss is set for _____ _____,
2005 at _____ o'clock _.m. in the UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION
SIGNED on this _____ day of _____, 2005.

_____
JUDGE PRESIDING

# GWBS L.L.C. Independent Contractor Agreement

This Independent Contractor Agreement ("Agreement") is made and entered into this XO day of Dec _____, 20 O2 by and between Great Western Business Services, L.L.C. of Delaware ("GWBS") and the undersigned Independent Contractor ("IC").

## I. Recitals

GWBS prepares business valuations and advertises businesses that are for sale or are seeking investment capital. GWBS wishes to retain IC and IC wishes to be retained by GWBS for the purpose of soliciting and selling GWBS' advertising and valuation services in accordance with the terms of this Agreement.

## II. Agreement

NOW, THEREFORE, for and in consideration of the mutual promises and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, GWBS and IC agree as follows:

1. Definitions: For the purposes of this Agreement, the following terms have the meaning set forth below.

   a. "Product(s)" means:

      1. a GWBS prepared or procured valuation of a business which may include an opinion with respect to the fair market value of the business; and

      2. a GWBS-prepared advertisement appearing in various publications and other print, non-print, and electronic media, which publicizes in a generic, non-categorical manner, as GWBS deems appropriate, that a business or businesses are for sale or are seeking investment capital.

   b. "Approved Contract(s)" means:

      1. The For Sale By Owner Advertising Agreement;

      2. The Business Valuation Agreement;

      3. The Venture Capital Advertising; and

      4. The Franchisor Advertising Agreement

      in the forms that are being provided to IC contemporaneously with this Agreement (including any future amendments or modifications to same). Copies of said "Approved Contracts" are attached hereto as Exhibits 1-4.

   c. "Deposit" means: the funds collected by the IC from the Client at the time the Client executes an Approved Contract, as provided in the Approved Contracts.

   d. "Customer" or "Client" means: a business that is for sale or is seeking to raise capital or desires an evaluation of its business, and has, through its authorized director, officer, partner, owner, agent or representative solicited the products or services of GWBS.

   e. "Sales Services" means: the efforts and communications made to a Customer or potential Customer in order to convey and communicate the benefits of GWBS' products and services, including, but not limited to all sales oriented customer contact prior to, during, and after the execution of an Approved Contract. "Sales Services" also include all activities ancillary and relating to Customer contact including the recruitment, training, and supervision of Sub-Contractors who are responsible for providing "Sales Services" on behalf of GWBS.

   f. "Sub-Contractor" means: any entity engaged by the IC, whether as employee or IC, to act on behalf of the IC in fulfilling its obligations under this Agreement.

   g. "Competition" means:

      1. Soliciting or contacting businesses for the purpose of and with the intent to sell Products or Services substantially similar to those offered by GWBS to any such business in IC's Sales Region;

2.  Selling or attempting to sell Products [as defined in Section 1(a)] or Services substantially similar to those offered by GWBS in the IC's Sales Region;

3.  Providing Sales Services on behalf of GWBS under a name or organization other than GWBS; or

4.  The use of GWBS' confidential information for any purpose other than providing Sales Services herein.

h.  "IC's Sales Region" means and is limited to an area consisting of a 200-mile radius surrounding any and all addresses of Customers who have executed Approved Contracts (as those addresses appear on those Approved Contracts) as a result of IC's performance under this Agreement and, in addition, an area consisting of a 200-mile radius surrounding GWBS' address as it appears in this Agreement.

i.  "Leads" shall constitute the name(s) or identity of prospective Customers of GWBS regardless of the origination of said lead.

j.  "Marketing Materials" includes any information that utilizes the name, likeness, products, or services of GWBS either directly, or indirectly, and that is intended to be disseminated to the public.

k.  "Approved Marketing Materials" includes those marketing materials that have been approved in writing by 1) an officer of GWBS or 2) legal counsel to GWBS prior to the time of its dissemination to the public.

l.  "Training Materials" includes any information that utilizes the name, likeness, products, or services of GWBS either directly, or indirectly, and that is intended to be disseminated to trainees to educate said trainees in the characteristics, benefits, markets, competition, and operation of GWBS.

m.  "Approved Training Materials" includes those training materials that have been approved in writing by 1) an officer of GWBS or 2) legal counsel to GWBS prior to the time of its dissemination to said trainees.

Undertaking: IC shall be granted a non-exclusive right to provide GWBS with Sales Services. In undertaking to perform such Sales Services under this Agreement, IC shall devote its full time, energy and skill on a regular and consistent basis and apply such time and personnel as IC deems necessary to effectively design and implement a business valuation and advertising sales program. As part of the services to be rendered by IC under this Agreement, IC shall contact in person or by telephone, officers, directors, partners, owners, agents or representatives, as the case may be, of businesses that wish to advertise their business for sale in an effort to sell GWBS' Products by having the business execute Approved Contract(s).

Upon the execution of an Approved Contract by a Customer, IC shall collect from the Customer the Deposit. The Deposit shall be made payable by Customer to GWBS and shall be by check, money order, credit card, or wire transfer, in the amount specified in the Approved Contract(s).

Remitter of Approved Contract and Proceeds: If IC, or any of its Sub-Contractors, agents, employees, or representatives, receives or collects the executed Approved Contract and any funds representing all or any portion of any payment or other fee due to GWBS from a Customer, including, without limitation, the Deposit, then IC shall, within five (5) days of receipt of same, forward said funds directly to GWBS.

Interest on Past Due Amounts: Any and all sums due by IC to GWBS under this Agreement shall bear interest at a per annum interest rate equal to the lesser of 10% per annum or the maximum rate allowed by law from the date due until paid.

Acceptance of Customer: GWBS reserves the right to refuse any business not deemed acceptable by GWBS in its sole and absolute discretion and in such event, all fees paid by such Customer shall be immediately reimbursed. GWBS may refuse to accept the Approved Contract that has been otherwise executed by the Customer. In such event, no fees or commissions shall be deemed earned by IC as a result thereof.

Independent Contractor: IC is and shall at all times act as an independent contractor. Except as expressly agreed herein, the parties hereto acknowledge that GWBS does not have the authority, and this Agreement does not grant GWBS the right to direct or control the activities, hours of labor, or manner of performance of Sales Services by IC. IC acknowledges that it is not and never has been a joint venture, partner, or employee of GWBS. In connection with its undertakings hereunder IC may, in its discretion enter into agreements with Sub-Contractors. The number of such Sub-Contractors and their respective responsibilities, and any payments to such Sub-Contractors (whether salaried, commissioned, or otherwise), shall be in the discretion of, and shall be the sole responsibility of, IC. IC acknowledges and agrees that any and all costs and expenses incurred by IC in hiring such Sub-Contractors, including but not limited to salaries, benefits, workers' compensation or other insurance, payroll taxes and any other cost and expense

of any kind or character shall be the sole and exclusive liability and responsibility of IC, and IC hereby agrees to indemnify and hold harmless GWBS from any such liability or responsibility. Neither IC nor any of its Sub-Contractors or representatives shall obligate, bind, or contract on behalf of GWBS in any manner without GWBS' specific prior written consent, nor shall IC or any of its Sub-Contractors or representatives hold itself out to any third party as being authorized to do so.  IC and any of its Sub-Contractors are not authorized to enter into any contracts or agreements of any kind or character on behalf of GWBS under this Agreement.

Use of GWBS Materials: In providing Sales Services to GWBS' customers, IC is authorized to use only GWBS' "approved marketing materials" and "approved training materials."  Other than "approved marketing materials" and "approved training materials," IC is expressly forbidden to use the name, likeness, logo, or to otherwise communicate, either directly, or indirectly, any information about GWBS' products, services, or any other intellectual property of any kind owned, authored, or otherwise controlled by GWBS.  IC further agrees that with regard to any dissemination, communication, or representation of any kind to the public that relates either directly or indirectly to GWBS' products, services, or to the Sales Services to be provided to GWBS by IC, that IC shall make any and all such disseminations, communications, or representations only as provided in this Agreement and only in the express written name of IC and no other entity or organization whether affiliated with IC or not.  IC further agrees not to use the name "Great Western" or "GWBS" in isolation or in any other method or manner that is likely to cause confusion in the marketplace between the identity and purpose of GWBS and the identity and purpose of IC.  IC understands that use of unauthorized materials is grounds for immediate termination of this Agreement.

Commissions:   For performance under this Agreement, IC shall be entitled to a commission as follows:

    a.  In return for Sales Services provided by IC under this Agreement, GWBS agrees to pay ten percent (10%) of the Deposit on all Approved Contracts.

    b.  In consideration for its obligations under the Confidentiality provision of this Agreement, GWBS agrees to pay IC an additional seven and one half percent (7.5%) of the Deposit on all Approved Contracts.

    c.  In consideration for its obligations under the Non-Competition provision of this Agreement, GWBS agrees to pay IC an additional seven and one half percent (7.5%) of the Deposit on all Approved Contracts.

    d.  Total Commission: The total commission amount payable to IC for Sales Services, Confidentiality, and Non-Competition shall be twenty five percent (25%) of the Deposit on all Approved Contracts.  IC may also be eligible for additional compensation from GWBS based upon performance criteria established by GWBS in its normal course of business.

    e.  Bonus Commission:  IC shall be eligible to receive up to ten percent (10%) of the amount of any satisfaction payment (commonly referred to as "back end fee") as bonus commission under criteria established by GWBS in its normal course of business

Total Commission shall be paid on all Approved Contracts that are received by GWBS from the IC and that are accepted and executed by GWBS. Such payment shall be made by GWBS to the IC within a reasonable time after the Deposit is received by GWBS and after GWBS verifies that IC has fulfilled all obligations under this Agreement, GWBS accepts and approves the Client, and GWBS executes the Approved Contract(s).

Refunds/Charge backs:  Refunds shall be due and payable from IC to GWBS as follows:

a.  If any check or form of payment representing all or any portion of any payment or fee due to GWBS under an Approved Contract from any Customer is not collected by GWBS for any reason whatsoever, then IC shall reimburse GWBS for any commissions or fees paid by GWBS to IC based on such uncollected fee.

b.  In the event that a refund is issued to any Customer under an Approved Contract and the basis of said refund is the direct or indirect result of any act, omission, or failure arising out of the rendition of Sales Services by IC or its Sub-Contractors, IC shall reimburse GWBS for any commissions or fees paid by GWBS to IC for the transaction underlying the refund.

c.  IC expressly authorizes GWBS to withhold from the payment of commissions otherwise due and owing under this Agreement, the value of any reimbursement due to GWBS from IC.

Confidentiality:

a.  IC acknowledges that during the term of this Agreement, it will have access to and become familiar with certain confidential information and trade secrets of GWBS, including, without limitation, customer lists, sales information, sales presentations, training materials, formulas, patterns, devices, processes, records,

 

specifications, leads, and other compilations of information which are owned by GWBS and which are regularly used in the operation of the business of GWBS.

b.  IC specifically agrees, as a covenant separate and apart from any other covenant or promise contained herein and supported by separate consideration as provided herein, that IC, its Sub-Contractors, agents, owners, employees, or representatives shall not disclose any of the aforesaid confidential information or trade secrets, either directly or indirectly, nor will it use them in any way, either during the term of this Agreement or at any time thereafter, except as required in the course of performing Sales Services under this Agreement.

c.  IC acknowledges and agrees that all such confidential information and trade secrets constitute the sole and exclusive property of GWBS. All of the aforementioned confidential information and trade secrets and any and all of the files, records, documents, drawings, specifications, materials, customer lists, data, or leads used in the promotion or sale of any product or service offered by GWBS or any Sales Services rendered by IC, whether prepared by IC, Sub-Contractor, or GWBS, or otherwise coming into the possession of IC or any Sub-Contractor, shall remain the exclusive property of GWBS and shall be immediately returned to GWBS upon the termination of this Agreement.

d.  To further protect and enforce the Confidentiality Section of this Agreement, IC covenants and agrees to obtain and execute valid and binding Confidentiality Agreements between IC and any of its Sub-Contractors, agents, owners, employees, or representatives and with GWBS as the intended third party beneficiary of said Agreements. The consideration paid by IC to its Sub-Contractors, agents, owners, employees, or representatives shall be in a sufficient amount to render said Agreement as enforceable.

e.  If any provision of this Confidentiality Agreement shall be held to be contrary to law or invalid or unenforceable in any respect in any jurisdiction, or as to any one or more periods of time, region, scope, or business activities, the remaining provisions shall not be affected but shall remain in full force and effect as to the other remaining provisions, and any such invalid or unenforceable provisions shall be deemed, without further action on the part of the parties hereto, modified, amended, limited, and reformed to the extent necessary to render the same valid and enforceable. In addition, should any court of competent jurisdiction determine that any portion of this Confidentiality Agreement is void or unenforceable for any reason whatsoever, than IC shall, upon seven (7) days written notice, reimburse GWBS for the entire 7.5% commission previously paid by GWBS to IC as consideration for this Confidentiality Agreement.

f.  If IC violates any term or provision of this Section, then IC acknowledges and understands that the such a violation shall subject IC to immediate legal action, including but not limited to suit for temporary restraining order, temporary injunction, permanent injunction, damages, attorneys' fees and any and all of the rights and remedies to which GWBS may be entitled. IC expressly agrees to toll the statute of limitations under this confidentiality provision until four (4) years from the date GWBS discovers or should have discovered a breach of this Confidentiality Agreement.

<u>Non-Competition:</u>

a.  IC specifically agrees, as a covenant separate and apart from any other covenant or promise contained herein and supported by separate consideration equaling an additional seven and one half percent (7.5%) commission as provided herein, that during the term of this Agreement and for a period of twenty four (24) months, beginning on the date this Agreement terminates, that IC, its Sub-Contractors, agents, owners, employees, or representatives, will not, directly or indirectly, either through any form of ownership, or as an agent, advisor, consultant, employee, independent contractor, partner, lender, or in any other capacity, either for its own benefit or for the benefit of any other person, firm, corporation or other entity, without the prior written consent of GWBS, solicit or contact any lead, customer, or former customer of GWBS for the purpose of and with the intent to engage in Competition against GWBS. IC, its Sub-Contractors, agents, owners, employees, and representatives hereby covenant and agree that, during the term of this Agreement and for a period of twenty-four (24) months beginning on the date this Agreement terminates, it will not directly or indirectly, either through any form of ownership (other than ownership of securities of a publicly held corporation which IC owns less than five percent (5%) of any class of outstanding securities), or as an agent, advisor, consultant, employee, independent contractor, partner, lender, or in any other capacity, either for its own benefit or for the benefit of any other person, firm, corporation, or other entity, without the prior written consent of the Company, engage in Competition against GWBS.

b.  To further protect and enforce the Non-Competition Section of this Agreement, IC covenants and agrees to obtain and execute valid and binding Non-Competition Agreements between IC and any of its Sub-Contractors, agents, owners, employees, or representatives and with GWBS as the intended third party beneficiary of said Agreements with consideration adequate to support said agreements.

c.  If any provision of this Non-Competition Agreement shall be held to be contrary to law or invalid or unenforceable in any respect in any jurisdiction, or as to any one or more periods of time, region, scope, or business activities, the remaining provisions shall not be affected but shall remain in full force and effect as to the other remaining provisions, and any such invalid or unenforceable provisions shall be deemed, without further action on the part of the parties hereto, modified, amended, limited, and reformed to the extent necessary to render the same valid and enforceable.  In addition, should any court of competent jurisdiction determine that any portion of this Non-Competition Agreement is void or unenforceable for any reason whatsoever, than IC shall, upon seven (7) days written notice, reimburse GWBS for the entire 7.5% commission previously paid by GWBS to IC under this Agreement.

d.  If IC violates any term or provision of this Non-Competition Agreement, then IC acknowledges and understands that the same shall subject IC to immediate legal action, including but not limited to suit for temporary restraining order, temporary injunction, permanent injunction, damages, attorneys' fees and any and all of the rights and remedies to which GWBS may be entitled. IC expressly agrees to toll the statute of limitations under this non-competition provision until four (4) years from the date GWBS discovers or should have discovered a breach of this provision.

Leads:

a.  IC shall, from time to time, be provided with leads from GWBS.  IC expressly acknowledges that all leads are the sole and exclusive property of GWBS, that IC has no ownership interest of any kind in such lead, and that all such leads constitute proprietary and confidential information of GWBS subject to the Confidentiality provision of this Agreement.

b.  IC expressly acknowledges that GWBS is the sole and exclusive source of leads for IC and that in providing Sales Services for GWBS under this agreement, IC, its Sub-Contractors, owners, agents, employees, and representatives are prohibited from obtaining and developing Customer leads either internally or from external sources without first obtaining advance written consent from an officer of GWBS.  In the event such consent is granted to IC, all such leads shall be turned over to GWBS immediately and shall not be acted upon or distributed to any Sub-Contractor or third party unless and until an officer of GWBS approves said distribution.

c.  IC shall, from time to time, be provided the names of prospective clients ("leads") by GWBS. IC shall either pay GWBS $100.00 for each lead provided by GWBS or shall return said lead to GWBS, properly coded in accordance with GWBS' procedure manual within thirty (30) days. In the event IC fails to pay $100.00 fee for each lead or fails to return each lead properly coded to GWBS within (30) days, GWBS may file a Form 1099 with the Internal Revenue Service and report the value of all leads provided by GWBS and not paid for by IC. IC expressly acknowledges that all leads are the sole and exclusive property of GWBS and that all leads constitute proprietary and confidential information of GWBS in which IC has no ownership interest whatsoever

Pricing: GWBS reserves the right to change the rates and pricing structure charged by GWBS for its services under Approved Contracts, from time to time, without prior notice to IC. In addition, GWBS retains the right to propose to increase or decrease all commissions to be paid or payable by GWBS pursuant to this Agreement.  Any such proposal shall be made in writing to IC by a notice sent to the address set forth below by certified mail, return receipt requested, and accepted by IC or IC's authorized representative(s).  Such proposal shall be deemed to be accepted by IC and shall constitute an amendment to this Agreement if IC does not send notice to GWBS terminating this Agreement as required by this Agreement within ten (10) days of receipt of said notice of proposed change in commissions.

Indemnity:   IC, its Sub-Contractors, agents, representatives, employees, independent contractors, successors, assigns, heirs, administrators, executors and personal representatives hereby agree to indemnify, hold harmless and defend GWBS, its shareholders, officers, directors, agents, successors, assigns, and legal representatives of and from any and all claims, demands, liabilities, judgments, costs (including attorneys' fees), or suits of any kind or character resulting from or arising out of, whether directly or indirectly, this Agreement, the performance by IC or Sub-Contractor of the Services, including any theft, negligence, or misrepresentations or any other act or omission of said parties whether on behalf of GWBS or not and whether authorized or unauthorized.  In addition to any an all other indemnities provided hereunder, IC is fully liable for, and agrees to pay to GWBS and indemnify GWBS against, any losses of GWBS resulting from failure of IC or any of its Sub-Contractors to timely pay and turn over to GWBS any and all amounts due and owing to GWBS, including, without limitation, all Deposits collected by IC or any of its Sub-Contractors.

Termination:  This Agreement shall remain in full force and effect until same is terminated as hereinafter provided. Either party hereto may terminate this Agreement for any reason or for no reason whatsoever upon ten (10) days written notice to the other party.  Upon termination, GWBS shall pay IC any and all commissions due and owing on all Deposits collected by IC, less any offsets, credits, or refunds due to GWBS.  Upon termination, IC agrees that it will only be paid commissions on any Deposits that have been collected and deposited by GWBS as of the date of

termination. In addition the right to receive any additional compensation, awards, incentive trips, bonuses (including bonuses on satisfaction payments/back end fees) shall terminate immediately as of the date of termination.

In addition, IC shall be automatically terminated for violation of any one of the following covenants:

I.   IC shall not speculate or communicate to a client or prospective client as to the length of time it will take for a business to sell or procure an investor.

II.  IC shall not communicate or imply the quantity of buyers or investors in GWBS database for a particular type of business or any other business.

III. IC shall not indicate to a client how many similar or related businesses have been in GWBS' database or their past results.

IV.  IC shall not state that any business valuation prepared or procured by GWBS is a certified audit.

V.   IC shall not influence the Client in any way regarding the "Asking Price" of "The Business."

VI.  IC shall not submit any order without the required paperwork.

VII. IC shall not communicate that GWBS performs function other than the services described in the For Sale By Owner Advertising Agreement, Valuation Agreement, or Venture Capital Advertising Agreement.

VIII. IC shall not release the names of any existing or past clients unless expressly authorized by both client and GWBS.

IX.  IC shall not violate any other policy, procedure or amendment thereto that relates specifically to IC's duties and obligations under this Agreement.

Dispute Resolution: IC unequivocally consents and agrees that venue and jurisdiction over and aspect of the Agreement shall be in Dallas County, Texas. In addition, both GWBS and IC agree that any controversy or claim arising out of or relating to this contract, or the breach thereof, is subject to arbitration under the Federal Arbitration Act and shall be settled by binding arbitration to be conducted in Dallas, Texas and administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The costs of any arbitration shall be borne equally by the parties. A willful violation of this provision or any breach of this Agreement by Owner shall entitle GWBS to specific performance of this Agreement, to recover actual damages, to recover liquidated damages as stated herein and to receive reimbursement for GWBS' expenses and attorneys' fees incurred in securing enforcement herein.

Insurance: IC agrees at its sole cost and expense to obtain such policies of public liability insurance, fire and extended coverage insurance, worker's compensation insurance and such other forms of insurance as IC shall deem appropriate and in such limits as GWBS shall have the right to approve to fully insure IC, its Sub-Contractors, agents, servants, and employees from any of the insurable perils as described in said policies. Copies of any policies of insurance to be obtained by IC hereunder shall be furnished to GWBS not later than thirty (30) days from the date of execution of this Agreement.

Notices: All notice, offers, request, instructions, acceptance, consents, approvals and other communication required or authorized to be given by either party to the other under this Agreement shall be in writing, shall be addressed as indicated below, and shall be deemed to be received, whether actually received or not when deposited in the U.S. mail, postage prepaid, via registered or certified mail, return receipt requested, addressed to GWBS and IC as the case may be, as set forth below such parties' signatures hereto or at such other address as the parties may from time to time specify in writing.

No Assignment: The rights and duties of IC under this Agreement are personal and may not be assigned or delegated without prior written consent of GWBS, which consent may be withheld in the Company's sole and absolute discretion.

No Agency: IC is not authorized to extend any warranty or guarantee or to make representations or claims with respect to GWBS' services without express written authorization from GWBS.

No other Legal Relationship: This Agreement shall not create a partnership, joint venture, agency, employer-employee or similar relationship between GWBS and IC. IC shall not be considered a partner with GWBS and shall not be entitled to participate in any plan, arrangement or distribution by GWBS pertaining to or in connection with any pension, stock, bonus, profit sharing or other benefit extended to GWBS' employees.

Injunctive Relief: IC understands that any violation of this Agreement by IC, its Sub-Contractors or representatives will cause GWBS immediate and irreparable harm which money damages cannot adequately remedy. Therefore, upon any actual or impending violation of this Agreement, IC, its Sub-Contractors and representatives consent to the issuance of a restraining order, preliminary and/or permanent injunction, without bond, restraining or enjoining such violation by IC, its Sub-Contractors, or representatives. IC understands that such orders are additional to and do not limit the availability to GWBS of any other remedy.

Damages Waiver: In the event of a dispute in arbitration or litigation, GWBS and IC hereby waive, to the fullest extent permitted by law, any right to or claim of punitive or exemplary damages against the other and may recover only actual damages, attorneys' fees and liquidated damages as stated herein.

Liquidated Damages: In the event of a breach by IC of its obligations to provide Sales Services, its duties under the Confidentiality and Non-Competition Agreements or any other breach of this Agreement, it is hereby agreed that GWBS will incur certain damages, lost profits, and costs that are not readily ascertainable. Therefore, in the event of such a breach, IC shall pay to GWBS the liquidated damages as follows:

a.      For breach of its general obligations under this Agreement to provide Sales Services as defined herein, IC shall reimburse GWBS for the dollar for dollar value of GWBS' actual damages plus any fees, expenses, and costs incurred by GWBS in securing performance under this Agreement.

b.      For breach of its Confidentiality Agreement as defined herein, IC shall refund to GWBS all of the previous 7.5% commissions paid to IC for the Confidentiality Covenant from the date of execution of this contract until the date that GWBS first discovers the breach. In addition, IC shall be required to reimburse GWBS for any fees, expenses, and costs incurred by GWBS in securing performance under this Agreement.

c.      For breach of its Non-Competition Agreement as defined herein, IC shall refund to GWBS all of the previous 7.5% commissions paid to IC for the Non-Competition Covenant from the date of execution of this contract until the date that GWBS first discovers the breach. In addition, IC shall be required to reimburse GWBS for any fees, expenses, and costs incurred by GWBS in securing performance under this Agreement.

d.      GWBS and IC agree that the amounts established by this Paragraph as liquidated damages are reasonable under the circumstances existing at the time of the execution of this Agreement and that payment of said sum by IC shall exclude IC from any further liability under this Agreement.

Waiver: Any failure by GWBS to enforce and require the strict keeping and performance of any of the terms and conditions of this Agreement shall not constitute a waiver of any such terms and conditions at any future time and shall not prevent GWBS from insisting on the strict keeping and performance of such terms and conditions at any later time.

Modifications to be in writing: This Agreement shall not be modified or rescinded except by written instrument signed by authorized representative of both parties hereto.

Copies of Agreement:  This Agreement may be executed in two or more counterparts, each constitute one and the same instrument.

Governing Law.  The Terms and Conditions of this Agreement shall be construed pursuant to and in accordance with the laws of the state of Texas and all of the covenants and obligations hereunder are fully enforceable and performable in the City of Dallas, Dallas County, Texas.

Venue:  IC irrevocably consents and hereby agrees that any lawsuit relating to any matter arising under this Agreement shall be initiated in a State or Federal Court in the City of Dallas, Dallas County, Northern District of Texas, State of Texas, United States of America.

Jurisdiction:  IC irrevocably consents to the jurisdiction and to the service of process, pleading, and notices in connection with any and all actions and processes initiated in a State or Federal court located in the City of Dallas, Dallas County, Northern District of Texas, State of Texas, United States of America.

Binding Effect and Benefit.  This Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto and their respective successors and assigns in the event that said party is a corporation or said parties' respective heirs, executors, successors, assigns, and personal representatives in the event said party is an individual.

Authority.  Each party hereto represents and warrants to the other that the individual signing this document below has the full authority to bind the entity for which said individual is signing to the terms and conditions hereof and that this Agreement and the performance of the terms, conditions, and covenants hereof is fully authorized by and binding upon said entity.

Partial Invalidity:  In the event that any term or provision of this Agreement shall be deemed by a court of competent jurisdiction to be overly broad in scope, duration or area of applicability, such court shall have the power, and is hereby directed, to limit such scope, duration or area of applicability, or all of them, so that such term or provision is not overly broad, and to enforce the same as so limited. Subject to the foregoing sentence, in the event any provision

of this Agreement shall be held invalid or unenforceable for any reason, such invalidity or unenforceability shall attach only to such provision and shall not affect or render invalid any other provision of this Agreement. It is hereby declared the intention of the parties that they would have executed the remaining portion of this Agreement without including any such part, parts, or portion, which may, for any reason, be hereafter declared invalid.

Entire Agreement Amendment. This Agreement supersedes any and all other agreements, either oral or written with respect to the subject matter hereof and contains all of the covenants and agreements between the parties with respect to said matters. Each party to this Agreement acknowledges that no representations, inducements, promises, or agreements, orally or otherwise, have been made by any party, or anyone acting on behalf of any party, which are not embodied herein, and that no other agreement, statement or promise not contained in this Agreement shall be valid or binding. No change, modification, amendment, addition, or deletion to this Agreement shall be valid unless in writing and signed by or on behalf of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and made effective of the day and year first above written and IC acknowledges he/she has read, understands, and agrees to be bound by each and every term of this Agreement.

_Wayne Lee_ _____
Independent Contractor, Individually

_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_ _____
SS #

_501-834-8084_ _____
Phone #

_10900 Incas Dr._ _____
Address

_N. Little Rock_ _____
City

_AR_   _72116_ _____
State       Zip

_AARC_ _____
Corporation Name*

_71-0779504_ _____
Tax ID #

_wlee52@yahoo.com_ _____
E-mail address

ACCEPTED BY:

_____
Authorized Representative, GWBS, L.L.C.

*If IC has signed on behalf of a corporation or partnership, he/she acknowledges and agrees that he/she has also signed and agreed to be bound individually as a person.

# GREAT WESTERN
# BUSINESS SERVICES, INC.

## INDEPENDENT CONTRACTOR AGREEMENT

This Independent Contractor Agreement (the "Agreement") is made and entered into this _10_ day of _Jan_, 199_2000_ by and between GREAT WESTERN BUSINESS SERVICES, INC., (the "Company") and the undersigned independent contractor (the "Independent Contractor").

## RECITALS

A.   The Company prepares business evaluations and advertises businesses that are for sale or are seeking to raise capital.

B.   The Company wishes to retain Independent Contractor and Independent Contractor wishes to be retained by the Company for the purpose of selling business evaluations and advertising to businesses that are for sale or are seeking to raise capital in accordance with the terms of this Agreement.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the mutual promises and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Independent Contractor agree as follows:

1.   <u>Definitions:</u>  For the purposes of this Agreement, the following terms have the meaning set forth below:

   (a)   "Product(s)" means: (i) a Company-prepared evaluation of a business which may include an opinion with respect to the fair market value of the business; and (ii) a Company-prepared advertisement appearing in various publications and other print and non-print media which publicizes in a generic, non-categorical manner, as the Company deems appropriate, that a business is for sale or is seeking to raise capital.

   (b)   "Approved Contract(s)" means: (i) the For Sale By Owner Advertising Agreement; (ii) the Business Evaluation Agreement; and (iii) the Venture Capital Advertising Agreement in the forms that are being provided to the Independent Contractor contemporaneously with this Agreement, as the same may be amended and modified by the Company.

   (c)   "Initial Payment" means:  the funds collected by the Independent Contractor from the Client at the time the Client executes an Approved Contract, as provided in the Approved Contracts.

   (d)   "Client" means:  a business that is for sale, is seeking to raise capital or desires an evaluation of its business, and has, through its authorized director, officer, partner, owner, agent or representative, executed an Approved Contract and delivered the Initial Payment to the Independent Contractor.

   (e)   "Services" means:  the efforts of Independent Contractor under this Agreement to sell Products by having businesses execute Approved Contracts.

   (f)   "Sub-Contractor" means:  any entity engaged by the Independent Contractor, whether as employee or independent contractor, to act on behalf of the Independent Contractor in fulfilling its obligations under this Agreement.

2.   <u>Undertaking:</u>  Independent Contractor shall perform such Services and apply such time and personnel as Independent Contractor deems necessary to effectively design and implement an effective business evaluation and advertising sales program. As part of the Services to be rendered by Independent Contractor under this Agreement, Independent Contractor

Page 1 of 6
Great Western Business Services, Inc.
Independent Contractor Agreement
FORM REVISED 01-05-97

GWBS, Inc. © 1984-1999

Initials: _GRP_

shall contact in person or by telephone, officers, directors, partners, owners, agents or representatives, as the case may be, of businesses that wish to advertise their business for sale in an effort to sell Products by having the business execute Approved Contract(s). Upon the execution of an Approved Contract by a Client, Independent Contractor shall collect from the Client the Initial Payment. The Initial Payment shall be made payable by Client to Great Western Business Services, Inc. and shall be by check, money order, or wire transfer, in the amount specified in the Approved Contract(s). Promptly upon receipt of the executed Approved Contract and the Initial Payment, and in no event later than five (5) days after the execution of the Approved Contract, Independent Contractor shall deliver the Approved Contract and the Initial Payment to the Company. The Company reserves the right to refuse any business not deemed acceptable by Company in its sole and absolute discretion and in such event, all fees paid by such Client shall be immediately reimbursed and the Company may refuse to execute the Approved Contract that has been executed by the Client. No fees or commissions shall be deemed earned by Independent Contractor as a result thereof.

3. <u>Independent Contractor:</u> Independent Contractor is, and shall at times act as, an independent contractor. The parties hereto acknowledge that the Company does not have the authority, and this Agreement does not grant the Company the right, to direct or control the activities, hours of labor, or manner of performance of Services by Independent Contractor. Independent Contractor acknowledges that it is not now nor has it ever been, a joint venturer, partner, or employee of the Company. In connection with its undertakings hereunder, Independent Contractor may, in its discretion enter into agreements with Sub-Contractors. The number of such Sub-Contractors and their respective responsibilities, and any payments to such Sub-Contractors (whether salaried, commissioned, or otherwise), shall be in the discretion of, and shall be the sole responsibility of, Independent Contractor. Independent Contractor acknowledges and agrees that any and all costs and expenses incurred by Independent Contractor in hiring such Sub-Contractors, including but not limited to salaries, benefits, workers' compensation or other insurance, payroll taxes, and any other cost and expense of any kind or character shall be the sole and exclusive liability and responsibility of Independent Contractor, and Independent Contractor hereby agrees to indemnify and hold harmless the Company from any such liability or responsibility. Neither Independent Contractor nor any Sub-Contractor shall obligate or bind the Company in any manner without the Company's specific prior written consent, nor shall any Independent Contractor or any of its Sub-Contractors hold itself out to any third party as being authorized to do so. Independent Contractor and any of its Sub-Contractors shall not, nor is Independent Contractor or any of its Sub-Contractors, authorized to enter into any contracts or agreements of any kind or character on behalf of the Company under this Agreement.

4. <u>Not Brokers:</u> Independent Contractor acknowledges that neither Company nor any person or entity affiliated therewith is a licensed real estate broker or salesperson pursuant to the laws of the State of Texas or any other state and that no part of the services to be performed hereunder involves, directly or indirectly, the sale, holding out for sale, or offer of sale in any form or manner of real estate or real property, or any other activity or conduct that would require Independent Contractor to be licensed as a real estate broker under the laws and regulations of the state in which Independent Contractor operates ("Broker Activity"). Independent Contractor agrees not to engage in any Broker Activity in performing services hereunder and agrees to cause any Sub-Contractor not to engage in Broker Activity in performing services hereunder. Independent Contractor and any Sub-Contractor performing the Services on behalf of Independent Contractor shall advise each and every Client and potential Client that they are not state licensed real estate brokers or salespeople and that the sale or offering for sale of real estate or real property is not a service that will be provided by the Independent Contractor, its Sub-Contractors, or by the Company.

5. <u>Commissions:</u>

    (a)    For the performance of the Services, the Company agrees to pay to Independent Contractor _Twenty-Seven_ percent ( _27_ %) of the Initial Payment on all Approved Contracts that are received by the Company from the Independent Contractor and that are accepted and executed by the Company. Such payment shall be made by the Company to the Independent Contractor within a reasonable time after the Initial Payment is received by the Company, the Company verifies (to its sole satisfaction) that Independent Contractor has fulfilled all obligations under this Agreement, the Company accepts and approves the Client as a client of the Company, and the Company executes the Approved Contract(s).

    (b)    If any check or other payment representing all or any portion of any payment or fee due the Company from any Client is not collected by the Company for any reason whatsoever, then Independent Contractor shall reimburse the Company for any commissions or fees paid by the Company to the Independent Contractor based on such uncollected fee.

GWBS, Inc. © 1984-1999

Initials: 

Independent Contractor shall refund to the Company any commissions paid to Independent Contractor as a result of any payments being refunded to any Client for any reason. All such refunds shall be made payable to the Company by cashiers or certified check and shall be due immediately upon demand. The Company reserves the right in its sole and absolute discretion to off-set from future commissions due to Independent Contractor under this Agreement, any unrefunded commissions due and owing under this subparagraph.

(c)    The Company retains the right to change the rates and pricing structure charged by the Company for its services under the Approved Contracts, from time to time, without prior notice to Independent Contractor. In addition, the Company retains the right to propose to increase all commissions to be paid or payable by the Company pursuant to this Agreement and to propose to decrease all commissions to be paid or payable by the Company pursuant to this agreement. Any such proposal shall be made in writing to Independent Contractor by a notice sent to the address set forth below Independent Contractor's signature hereto. Such proposal shall be deemed to be accepted by Independent Contractor and shall constitute an amendment to this Agreement if Independent Contractor does not send a notice to the Company terminating this Agreement pursuant to Section 8 hereof within 10 days after the date of the notice of the proposed change in commissions.

(d)    If Independent Contractor or any of its Sub-Contractors, agents, employees, or representatives, receives funds representing all or any portion of any payment or other fee due the Company from a Client, including, without limitation, the Initial Payment, then Independent Contractor shall, within five (5) days of receipt of same, forward said funds directly to the Company. Any and all sums due by Independent Contractor to the Company under this Agreement shall bear interest at a per annum interest rate equal to the lesser of 18% per annum or the maximum rate allowed by law from the date due until paid.

6.    Leads:  Independent Contractor shall, from time to time, be provided the names of prospective clients ("Leads") by the Company. Independent Contractor shall either pay the Company seventy dollars ($70.00) for each Lead provided by the Company or shall return said Lead to the Company, properly coded in accordance with the Company's procedure manual within thirty (30) days. In the event Independent Contractor fails to pay the seventy dollar ($70.00) fee for each Lead or fails to return each Lead properly coded to the Company within (30) days, Company may file a Form 1099 with the Internal Revenue Service and report the value of all Leads provided by Company and not paid for by Independent Contractor. Independent Contractor expressly acknowledges that all Leads are the sole and exclusive property of the Company, and that all Leads constitute proprietary and confidential information of the Company in which Independent Contractor has no ownership interest whatsoever.

7.    Confidentiality and Non-Competition:

(a)    Independent Contractor acknowledges that during the term of this Agreement, it will have access to and become familiar with certain confidential information and trade secrets of the Company, including, without limitation, customer lists, sales information, sales presentations, training materials, formulas, patterns, devices, processes, records, specifications, Leads, and other compilations of information which are owned by the Company and which are regularly used in the operation of the business of the Company. Independent Contractor shall not disclose any of the aforesaid confidential information or trade secrets, ether directly or indirectly, nor will it use them in any way, either during the term of this Agreement or at any time thereafter, except as required in the course of performing Services under this Agreement. Independent Contractor acknowledges and agrees that all such confidential information and trade secrets constitutes the sole and exclusive property of the Company. All of the aforementioned confidential information and trade secrets and any and all of the files, records, documents, drawings, specifications, materials, customer lists, data, or Leads used in the promotion or sale of any Product offered by the Company or Service rendered by the Independent Contractor, whether prepared by Independent Contractor, Sub-Contractor, or the Company, or otherwise coming into the possession of the Independent Contractor or any Sub-Contractor, shall remain the exclusive property of the Company and shall be immediately returned to the Company upon the termination of this Agreement. Independent Contractor further specifically agrees, as a covenant separate from, and in no way limiting, Independent Contractor's covenants contained in Sections 7(b) and 7(c) hereof, that, during the term of this Agreement and for a period of two (2) years beginning on the date this Agreement terminates, it will not, directly or indirectly, either through any form of ownership, or as an agent, advisor, consultant, employee, independent contractor, partner, lender, or in any other capacity, either for its own benefit or for the benefit of any other person, firm, corporation or other entity,

without the prior written consent of the Company, solicit or contact any Lead, client, or former client of the Company for the purpose of and with the intent to sell Products (as specifically defined in Section 7(c) hereof) in the Independent Contractor's Sales Region (as defined below).

(b)    Independent Contractor hereby covenants and agrees that, during the term of this Agreement and for a period of two (2) years beginning on the date this Agreement terminates, it will not, directly or indirectly, either through any form of ownership (other than ownership of securities of a publicly held corporation which Independent Contractor owns less than five percent (5%) of any class of outstanding securities), or as an agent, advisor, consultant, employee, independent contractor, partner, lender, or in any other capacity, either for its own benefit or for the benefit of any other person, firm, corporation, or other entity, without the prior written consent of the Company, engage in Competition (as defined below) in the Independent Contractor's Sales Region (as defined below).

(c)    The term "Competition" means and is limited to (i) soliciting or contacting businesses for the purpose of and with the intent to sell Products to any such business in the Independent Contractor's Sales Region; or the (ii) selling or attempting to sell Products in the Independent Contractor's Sales Region. For the purposes of this paragraph, Products means "Products" as defined in Section 1(a) of this Agreement or any other similar business evaluation or advertisement prepared by any entity other than the Company. The term "Independent Contractor's Sales Region" means and is limited to an area consisting of a 200-mile radius surrounding any and all addresses of Clients who have executed Approved Contracts (as those addresses appear on those Approved Contracts) as a result of Independent Contractor's performance under this Agreement and, in addition, an area consisting of a 200-mile radius surrounding the Company's address as it appears in this Agreement.

(d)    If any provision of this Section 7 shall be held to be contrary to law or invalid or unenforceable in any respect in any jurisdiction, or as to any one or more periods of time, region, scope, or business activities, the remaining provisions shall not be affected but shall remain in full force and effect as to the other remaining provisions, and any such invalid or unenforceable provisions shall be deemed, without further action on the part of the parties hereto, modified, amended, limited, and reformed to the extent necessary to render the same valid and enforceable. The covenants contained in this Section 7 shall survive the termination of this Agreement.

(e)    If Independent Contractor violates any term or provision of this Section 7, then Independent Contractor acknowledges and understands that the same shall subject Independent Contractor to immediate legal action, including but not limited to suit for temporary restraining order, temporary injunction, permanent injunction, damages, attorneys' fees and any and all of the rights and remedies to which the Company may be entitled. Independent Contractor and the Company acknowledge and agree that in the event of any legal action under this paragraph or any other provision of this Agreement, that jurisdiction and venue of any such proceedings shall be in the appropriate court in Dallas County, Texas.

8.    Term: This Agreement shall remain in full force and effect until same is terminated as hereinafter provided. Either party hereto may terminate this Agreement for any reason or for no reason whatsoever upon 10 days written notice to the other party. The Company shall pay to Independent Contractor any and all commissions earned by Independent Contractor under this Agreement until this agreement is terminated.

9.    Indemnity:

(a)    Independent Contractor, its Sub-Contractors, agents, representatives, employees, independent contractors, successors, assigns, heirs, administrators, executors and personal representatives hereby agree to indemnify, hold harmless and defend the Company, its shareholders, officers, directors, agents, successors, assigns, and legal representatives of and from any and all claims, demands, liabilities, judgements, costs (including attorneys' fees), or suits of any kind or character resulting from or arising out of, whether directly or indirectly, this Agreement, the performance by Independent Contractor or Sub-Contractor of the Services, or any other act or omission of said parties whether on behalf of the Company or not and whether authorized or unauthorized.

(b)    In addition to any an all other indemnities provided hereunder, Independent Contractor is fully liable for, and agrees to pay to the Company and indemnify the Company against, any losses of the Company resulting from failure of Independent Contractor or any of its Sub-Contractors to timely pay and turn over to the Company any and all amounts

GWBS, Inc. © 1984-1999

Initials: _____

due and owing to the Company, including, without limitation, all Initial Payments collected by Independent Contractor or any of its Sub-Contractors.

10.  Notice:  Any notice required or permitted to be delivered hereunder shall be deemed to be received, whether actually received or not, when deposited in the United States mail, postage prepaid, Registered or Certified Mail, Return Receipt Requested, addressed to Company and Independent Contractor as the case may be, as set forth below such parties' signatures hereto, or at such other address as the parties may from time to time specify in writing.

11.  Insurance:

    (a)  Independent Contractor agrees at its sole cost and expense to obtain such policies of public liability insurance, fire and extended coverage insurance, worker's compensation insurance and such other forms of insurance as Independent Contractor shall deem appropriate and in such limits as the Company shall have the right to approve to fully insure Independent Contractor, its Sub-Contractors, agents, servants, and employees from any of the insurable perils as described in said policies.

    (b)  Copies of any policies of insurance to be obtained by Independent Contractor hereunder shall be furnished to the Company not later than thirty (30) days from the date of execution of this Agreement.

12.  No Assignment:  This Agreement is not assignable by Independent Contractor without the Company's prior written consent, which consent may be withheld in the Company's sole and absolute discretion.

13.  Governing Law:  The Terms and Conditions of this Agreement shall be construed pursuant to and in accordance with the laws of the state of Texas and all of the covenants and obligations hereunder are fully enforceable and performable in the City of Dallas, Dallas County, Texas.  If any legal action is commenced by any party to this Agreement against any other party to this Agreement, then all parties hereto expressly agree that jurisdiction and venue for such action shall be in the District Courts or other appropriate court of Dallas County, Texas.

14.  Binding Effect and Benefit:  This Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto and their respective successors and assigns in the event that said party is a corporation or said parties' respective heirs, executors, successors, assigns, and personal representatives in the event said party is an individual.

15.  Authority:  Each party hereto represents and warrants to the other that the individual signing this document below has the full authority to bind the entity for which said individual is signing to the terms and conditions hereof and that this Agreement and the performance of the terms, conditions, and covenants hereof is fully authorized by and binding upon said entity.

16.  Invalid Provisions:  If any part of this Agreement for any reason is declared invalid, such decision shall not affect the validity of any remaining portion, which remaining portion shall remain in full force and effect as if this Agreement had been executed with the invalid portion thereof eliminated.  It is hereby declared the intention of the parties that they would have executed the remaining portion of this Agreement without including any such part, parts, or portion which may, for any reason, be hereafter declared invalid.

17.  Entire Agreement Amendments:  This Agreement supersedes any and all other agreements, either oral or written with respect to the subject matter hereof and contains all of the covenants and agreements between the parties with respect to said matters. Each party to this Agreement acknowledges that no representations, inducements, promises, or agreements, orally or otherwise, have been made by any party, or anyone acting on behalf of any party, which are not embodied herein, and that no other agreement, statement or promise not contained in this Agreement shall be valid or binding.  No change, modification, amendment, addition, or deletion to this Agreement shall be valid unless in writing and signed by or on behalf of the parties hereto.

18.  Waiver:  Any waiver or forbearance by the Company of any right or remedy under this Agreement shall not constitute a waiver or release of the Company's exercising said right or remedy or any other right or remedy provided under this Agreement or under applicable law in the future.

Page 5 of 6
Great Western Business Services, Inc.
Independent Contractor Agreement
FORM REVISED 01-05-97

GWBS, Inc. © 1984-1999

Initials:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and made effective as of the day and year first above written.

GREAT WESTERN BUSINESS SERVICES, INC.

By: _____
John Bradley, President

Address:  14643 Dallas Parkway, Suite 650
Dallas, Texas  75240

INDEPENDENT CONTRACTOR:

X _____
Signature

*If Independent Contractor has signed on behalf of a
corporation or partnership, he/she acknowledges and
agrees that he/she has also signed as a person and
individually.

_John   Persaud_____
Print Name

_Glenmary    62-1628163_____
Print Corporate Name

Address: _9907 Willow Brook Circle_____
_Louisville, Ky 40223_____

_____

_____

_____
Witness

# GWBS L.L.C. Independent Contractor Agreement

This Independent Contractor Agreement ("Agreement") is made and entered into this _15th_ day of _Dec_, 20_02_ by and between Great Western Business Services, L.L.C. of Delaware ("GWBS") and the undersigned Independent Contractor ("IC").

## I. Recitals

GWBS prepares business valuations and advertises businesses that are for sale or are seeking investment capital. GWBS wishes to retain IC and IC wishes to be retained by GWBS for the purpose of soliciting and selling GWBS' advertising and valuation services in accordance with the terms of this Agreement.

## II. Agreement

NOW, THEREFORE, for and in consideration of the mutual promises and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, GWBS and IC agree as follows:

1. Definitions: For the purposes of this Agreement, the following terms have the meaning set forth below.

   a. "Product(s)" means:

      1. a GWBS prepared or procured valuation of a business which may include an opinion with respect to the fair market value of the business; and

      2. a GWBS-prepared advertisement appearing in various publications and other print, non-print, and electronic media, which publicizes in a generic, non-categorical manner, as GWBS deems appropriate, that a business or businesses are for sale or are seeking investment capital.

   b. "Approved Contract(s)" means:

      1. The For Sale By Owner Advertising Agreement;

      2. The Business Valuation Agreement;

      3. The Venture Capital Advertising; and

      4. The Franchisor Advertising Agreement

      in the forms that are being provided to IC contemporaneously with this Agreement (including any future amendments or modifications to same). Copies of said "Approved Contracts" are attached hereto as Exhibits 1-4.

   c. "Deposit" means: the funds collected by the IC from the Client at the time the Client executes an Approved Contract, as provided in the Approved Contracts.

   d. "Customer" or "Client" means: a business that is for sale or is seeking to raise capital or desires an evaluation of its business, and has, through its authorized director, officer, partner, owner, agent or representative solicited the products or services of GWBS.

   e. "Sales Services" means: the efforts and communications made to a Customer or potential Customer in order to convey and communicate the benefits of GWBS' products and services, including, but not limited to all sales oriented customer contact prior to, during, and after the execution of an Approved Contract. "Sales Services" also include all activities ancillary and relating to Customer contact including the recruitment, training, and supervision of Sub-Contractors who are responsible for providing "Sales Services" on behalf of GWBS.

   f. "Sub-Contractor" means: any entity engaged by the IC, whether as employee or IC, to act on behalf of the IC in fulfilling its obligations under this Agreement.

   g. "Competition" means:

      1. Soliciting or contacting businesses for the purpose of and with the intent to sell Products or Services substantially similar to those offered by GWBS to any such business in IC's Sales Region;

---

2.  Selling or attempting to sell Products [as defined in Section 1(a)] or Services substantially similar to those offered by GWBS in the IC's Sales Region;

3.  Providing Sales Services on behalf of GWBS under a name or organization other than GWBS; or

4.  The use of GWBS' confidential information for any purpose other than providing Sales Services herein.

h.  "IC's Sales Region" means and is limited to an area consisting of a 200-mile radius surrounding any and all addresses of Customers who have executed Approved Contracts (as those addresses appear on those Approved Contracts) as a result of IC's performance under this Agreement and, in addition, an area consisting of a 200-mile radius surrounding GWBS' address as it appears in this Agreement.

i.  "Leads" shall constitute the name(s) or identity of prospective Customers of GWBS regardless of the origination of said lead.

j.  "Marketing Materials" includes any information that utilizes the name, likeness, products, or services of GWBS either directly, or indirectly, and that is intended to be disseminated to the public.

k.  "Approved Marketing Materials" includes those marketing materials that have been approved in writing by 1) an officer of GWBS or 2) legal counsel to GWBS prior to the time of its dissemination to the public.

l.  "Training Materials" includes any information that utilizes the name, likeness, products, or services of GWBS either directly, or indirectly, and that is intended to be disseminated to trainees to educate said trainees in the characteristics, benefits, markets, competition, and operation of GWBS.

m.  "Approved Training Materials" includes those training materials that have been approved in writing by 1) an officer of GWBS or 2) legal counsel to GWBS prior to the time of its dissemination to said trainees.

<u>Undertaking:</u> IC shall be granted a non-exclusive right to provide GWBS with Sales Services.  In undertaking to perform such Sales Services under this Agreement, IC shall devote its full time, energy and skill on a regular and consistent basis and apply such time and personnel as IC deems necessary to effectively design and implement a business valuation and advertising sales program.  As part of the services to be rendered by IC under this Agreement, IC shall contact in person or by telephone, officers, directors, partners, owners, agents or representatives, as the case may be, of businesses that wish to advertise their business for sale in an effort to sell GWBS' Products by having the business execute Approved Contract(s).

Upon the execution of an Approved Contract by a Customer, IC shall collect from the Customer the Deposit. The Deposit shall be made payable by Customer to GWBS and shall be by check, money order, credit card, or wire transfer, in the amount specified in the Approved Contract(s).

<u>Remitter of Approved Contract and Proceeds</u>:  If IC, or any of its Sub-Contractors, agents, employees, or representatives, receives or collects the executed Approved Contract and any funds representing all or any portion of any payment or other fee due to GWBS from a Customer, including, without limitation, the Deposit, then IC shall, within five (5) days of receipt of same, forward said funds directly to GWBS.

<u>Interest on Past Due Amounts</u>:  Any and all sums due by IC to GWBS under this Agreement shall bear interest at a per annum interest rate equal to the lesser of 10% per annum or the maximum rate allowed by law from the date due until paid.

<u>Acceptance of Customer</u>:  GWBS reserves the right to refuse any business not deemed acceptable by GWBS in its sole and absolute discretion and in such event, all fees paid by such Customer shall be immediately reimbursed. GWBS may refuse to accept the Approved Contract that has been otherwise executed by the Customer.  In such event, no fees or commissions shall be deemed earned by IC as a result thereof.

<u>Independent Contractor</u>:  IC is and shall at all times act as an independent contractor.  Except as expressly agreed herein, the parties hereto acknowledge that GWBS does not have the authority, and this Agreement does not grant GWBS the right to direct or control the activities, hours of labor, or manner of performance of Sales Services by IC. IC acknowledges that it is not and never has been a joint venture, partner, or employee of GWBS.  In connection with its undertakings hereunder, IC may, in its discretion enter into agreements with Sub-Contractors. The number of such Sub-Contractors and their respective responsibilities, and payments to such Sub-Contractors (whether salaried, commissioned, or otherwise), shall be in the discretion of, and shall be the sole responsibility of, IC. IC acknowledges and agrees that any and all costs and expenses incurred by IC in hiring such Sub-Contractors, including but not limited to salaries, benefits, workers' compensation or other insurance, payroll taxes and any other cost and expense

of any kind or character shall be the sole and exclusive liability and responsibility of IC, and IC hereby agrees to indemnify and hold harmless GWBS from any such liability or responsibility. Neither IC nor any of its Sub-Contractors or representatives shall obligate, bind, or contract on behalf of GWBS in any manner without GWBS' specific prior written consent, nor shall IC or any of its Sub-Contractors or representatives hold itself out to any third party as being authorized to do so. IC and any of its Sub-Contractors are not authorized to enter into any contracts or agreements of any kind or character on behalf of GWBS under this Agreement.

<u>Use of GWBS Materials:</u> In providing Sales Services to GWBS' customers, IC is authorized to use only GWBS' "approved marketing materials" and "approved training materials." Other than "approved marketing materials" and "approved training materials," IC is expressly forbidden to use the name, likeness, logo, or to otherwise communicate, either directly, or indirectly, any information about GWBS' products, services, or any other intellectual property of any kind owned, authored, or otherwise controlled by GWBS. IC further agrees that with regard to any dissemination, communication, or representation of any kind to the public that relates either directly or indirectly to GWBS' products, services, or to the Sales Services to be provided to GWBS by IC, that IC shall make any and all such disseminations, communications, or representations only as provided in this Agreement and only in the express written name of IC and no other entity or organization whether affiliated with IC or not. IC further agrees not to use the name "Great Western" or "GWBS" in isolation or in any other method or manner that is likely to cause confusion in the marketplace between the identity and purpose of GWBS and the identity and purpose of IC. IC understands that use of unauthorized materials is grounds for immediate termination of this Agreement.

<u>Commissions:</u>  For performance under this Agreement, IC shall be entitled to a commission as follows:

    a.   In return for Sales Services provided by IC under this Agreement, GWBS agrees to pay ten percent (10%) of the Deposit on all Approved Contracts.

    b.   In consideration for its obligations under the Confidentiality provision of this Agreement, GWBS agrees to pay IC an additional seven and one half percent (7.5%) of the Deposit on all Approved Contracts.

    c.   In consideration for its obligations under the Non-Competition provision of this Agreement, GWBS agrees to pay IC an additional seven and one half percent (7.5%) of the Deposit on all Approved Contracts.

    d.   <u>Total Commission:</u> The total commission amount payable to IC for Sales Services, Confidentiality, and Non-Competition shall be twenty five percent (25%) of the Deposit on all Approved Contracts.  IC may also be eligible for additional compensation from GWBS based upon performance criteria established by GWBS in its normal course of business.

    e.   <u>Bonus Commission:</u>  IC shall be eligible to receive up to ten percent (10%) of the amount of any satisfaction payment (commonly referred to as "back end fee") as bonus commission under criteria established by GWBS in its normal course of business

Total Commission shall be paid on all Approved Contracts that are received by GWBS from the IC and that are accepted and executed by GWBS. Such payment shall be made by GWBS to the IC within a reasonable time after the Deposit is received by GWBS and after GWBS verifies that IC has fulfilled all obligations under this Agreement, GWBS accepts and approves the Client, and GWBS executes the Approved Contract(s).

<u>Refunds/Charge backs:</u>  Refunds shall be due and payable from IC to GWBS as follows:

a.   If any check or form of payment representing all or any portion of any payment or fee due to GWBS under an Approved Contract from any Customer is not collected by GWBS for any reason whatsoever, then IC shall reimburse GWBS for any commissions or fees paid by GWBS to IC based on such uncollected fee.

b.   In the event that a refund is issued to any Customer under an Approved Contract and the basis of said refund is the direct or indirect result of any act, omission, or failure arising out of the rendition of Sales Services by IC or its Sub-Contractors, IC shall reimburse GWBS for any commissions or fees paid by GWBS to IC for the transaction underlying the refund.

c.   IC expressly authorizes GWBS to withhold from the payment of commissions otherwise due and owing under this Agreement, the value of any reimbursement due to GWBS from IC.

<u>Confidentiality:</u>

a.   IC acknowledges that during the term of this Agreement, it will have access to and become familiar with certain confidential information and trade secrets of GWBS, including, without limitation, customer lists, sales information, sales presentations, training materials, formulas, patterns, devices, processes, records,



specifications, leads, and other compilations of information which are owned by GWBS and which are regularly used in the operation of the business of GWBS.

b.  IC specifically agrees, as a covenant separate and apart from any other covenant or promise contained herein and supported by separate consideration as provided herein, that IC, its Sub-Contractors, agents, owners, employees, or representatives shall not disclose any of the aforesaid confidential information or trade secrets, either directly or indirectly, nor will it use them in any way, either during the term of this Agreement or at any time thereafter, except as required in the course of performing Sales Services under this Agreement.

c.  IC acknowledges and agrees that all such confidential information and trade secrets constitute the sole and exclusive property of GWBS. All of the aforementioned confidential information and trade secrets and any and all of the files, records, documents, drawings, specifications, materials, customer lists, data, or leads used in the promotion or sale of any product or service offered by GWBS or any Sales Services rendered by IC, whether prepared by IC, Sub-Contractor, or GWBS, or otherwise coming into the possession of IC or any Sub-Contractor, shall remain the exclusive property of GWBS and shall be immediately returned to GWBS upon the termination of this Agreement.

d.  To further protect and enforce the Confidentiality Section of this Agreement, IC covenants and agrees to obtain and execute valid and binding Confidentiality Agreements between IC and any of its Sub-Contractors, agents, owners, employees, or representatives and with GWBS as the intended third party beneficiary of said Agreements.   The consideration paid by IC to its Sub-Contractors, agents, owners, employees, or representatives shall be in a sufficient amount to render said Agreement as enforceable.

e.  If any provision of this Confidentiality Agreement shall be held to be contrary to law or invalid or unenforceable in any respect in any jurisdiction, or as to any one or more periods of time, region, scope, or business activities, the remaining provisions shall not be affected but shall remain in full force and effect as to the other remaining provisions, and any such invalid or unenforceable provisions shall be deemed, without further action on the part of the parties hereto, modified, amended, limited, and reformed to the extent necessary to render the same valid and enforceable.  In addition, should any court of competent jurisdiction determine that any portion of this Confidentiality Agreement is void or unenforceable for any reason whatsoever, than IC shall, upon seven (7) days written notice, reimburse GWBS for the entire 7.5% commission previously paid by GWBS to IC as consideration for this Confidentiality Agreement.

f.  If IC violates any term or provision of this Section, then IC acknowledges and understands that the such a violation shall subject IC to immediate legal action, including but not limited to suit for temporary restraining order, temporary injunction, permanent injunction, damages, attorneys' fees and any and all of the rights and remedies to which GWBS may be entitled. IC expressly agrees to toll the statute of limitations under this confidentiality provision until four (4) years from the date GWBS discovers or should have discovered a breach of this Confidentiality Agreement.

<u>Non-Competition:</u>

a.  IC specifically agrees, as a covenant separate and apart from any other covenant or promise contained herein and supported by separate consideration equaling an additional seven and one half percent (7.5%) commission as provided herein, that during the term of this Agreement and for a period of twenty four (24) months, beginning on the date this Agreement terminates, that IC, its Sub-Contractors, agents, owners, employees, or representatives, will not, directly or indirectly, either through any form of ownership, or as an agent, advisor, consultant, employee, independent contractor, partner, lender, or in any other capacity, either for its own benefit or for the benefit of any other person, firm, corporation or other entity, without the prior written consent of GWBS, solicit or contact any lead, customer, or former customer of GWBS for the purpose of and with the intent to engage in Competition against GWBS. IC, its Sub-Contractors, agents, owners, employees, and representatives hereby covenant and agree that, during the term of this Agreement and for a period of twenty-four (24) months beginning on the date this Agreement terminates, it will not directly or indirectly, either through any form of ownership (other than ownership of securities of a publicly held corporation which IC owns less than five percent (5%) of any class of outstanding securities), or as an agent, advisor, consultant, employee, independent contractor, partner, lender, or in any other capacity, either for its own benefit or for the benefit of any other person, firm, corporation, or other entity, without the prior written consent of the Company, engage in Competition against GWBS.

b.  To further protect and enforce the Non-Competition Section of this Agreement, IC covenants and agrees to obtain and execute valid and binding Non-Competition Agreements between IC and any of its Sub-Contractors, agents, owners, employees, or representatives and with GWBS as the intended third party beneficiary of said Agreements with consideration adequate to support said agreements.

c.   If any provision of this Non-Competition Agreement shall be held to be contrary to law or invalid or unenforceable in any respect in any jurisdiction, or as to any one or more periods of time, region, scope, or business activities, the remaining provisions shall not be affected but shall remain in full force and effect as to the other remaining provisions, and any such invalid or unenforceable provisions shall be deemed, without further action on the part of the parties hereto, modified, amended, limited, and reformed to the extent necessary to render the same valid and enforceable.  In addition, should any court of competent jurisdiction determine that any portion of this Non-Competition Agreement is void or unenforceable for any reason whatsoever, than IC shall, upon seven (7) days written notice, reimburse GWBS for the entire 7.5% commission previously paid by GWBS to IC under this Agreement.

d.   If IC violates any term or provision of this Non-Competition Agreement, then IC acknowledges and understands that the same shall subject IC to immediate legal action, including but not limited to suit for temporary restraining order, temporary injunction, permanent injunction, damages, attorneys' fees and any and all of the rights and remedies to which GWBS may be entitled. IC expressly agrees to toll the statute of limitations under this non-competition provision until four (4) years from the date GWBS discovers or should have discovered a breach of this provision.

Leads:

a.   IC shall, from time to time, be provided with leads from GWBS.  IC expressly acknowledges that all leads are the sole and exclusive property of GWBS, that IC has no ownership interest of any kind in such lead, and that all such leads constitute proprietary and confidential information of GWBS subject to the Confidentiality provision of this Agreement.

b.   IC expressly acknowledges that GWBS is the sole and exclusive source of leads for IC and that in providing Sales Services for GWBS under this agreement, IC, its Sub-Contractors, owners, agents, employees, and representatives are prohibited from obtaining and developing Customer leads either internally or from external sources without first obtaining advance written consent from an officer of GWBS.  In the event such consent is granted to IC, all such leads shall be turned over to GWBS immediately and shall not be acted upon or distributed to any Sub-Contractor or third party unless and until an officer of GWBS approves said distribution.

c.   IC shall, from time to time, be provided the names of prospective clients ("leads") by GWBS. IC shall either pay GWBS $100.00 for each lead provided by GWBS or shall return said lead to GWBS, properly coded in accordance with GWBS' procedure manual within thirty (30) days. In the event IC fails to pay $100.00 fee for each lead or fails to return each lead properly coded to GWBS within (30) days, GWBS may file a Form 1099 with the Internal Revenue Service and report the value of all leads provided by GWBS and not paid for by IC. IC expressly acknowledges that all leads are the sole and exclusive property of GWBS and that all leads constitute proprietary and confidential information of GWBS in which IC has no ownership interest whatsoever

Pricing: GWBS reserves the right to change the rates and pricing structure charged by GWBS for its services under Approved Contracts, from time to time, without prior notice to IC.  In addition, GWBS retains the right to propose to increase or decrease all commissions to be paid or payable by GWBS pursuant to this Agreement.  Any such proposal shall be made in writing to IC by a notice sent to the address set forth below by certified mail, return receipt requested, and accepted by IC or IC's authorized representative(s).  Such proposal shall be deemed to be accepted by IC and shall constitute an amendment to this Agreement if IC does not send notice to GWBS terminating this Agreement as required by this Agreement within ten (10) days of receipt of said notice of proposed change in commissions.

Indemnity:   IC, its Sub-Contractors, agents, representatives, employees, independent contractors, successors, assigns, heirs, administrators, executors and personal representatives hereby agree to indemnify, hold harmless and defend GWBS, its shareholders, officers, directors, agents, successors, assigns, and legal representatives of and from any and all claims, demands, liabilities, judgments, costs (including attorneys' fees), or suits of any kind or character resulting from or arising out of, whether directly or indirectly, this Agreement, the performance by IC or Sub-Contractor of the Services, including any theft, negligence, or misrepresentations or any other act or omission of said parties whether on behalf of GWBS or not and whether authorized or unauthorized.  In addition to any an all other indemnities provided hereunder, IC is fully liable for, and agrees to pay to GWBS and indemnify GWBS against, any losses of GWBS resulting from failure of IC or any of its Sub-Contractors to timely pay and turn over to GWBS any and all amounts due and owing to GWBS, including, without limitation, all Deposits collected by IC or any of its Sub-Contractors.

?rmination:  This Agreement shall remain in full force and effect until same is terminated as hereinafter provided. ?r party hereto may terminate this Agreement for any reason or for no reason whatsoever upon ten (10) days ? notice to the other party.  Upon termination, GWBS shall pay IC any and all commissions due and owing on all ? collected by IC, less any offsets, credits, or refunds due to GWBS.  Upon termination, IC agrees that it will ?d commissions on any Deposits that have been collected and deposited by GWBS as of the date of

termination. In addition the right to receive any additional compensation, awards, incentive trips, bonuses (including bonuses on satisfaction payments/back end fees) shall terminate immediately as of the date of termination.

In addition, IC shall be automatically terminated for violation of any one of the following covenants:

I.     IC shall not speculate or communicate to a client or prospective client as to the length of time it will take for a business to sell or procure an investor.

II.    IC shall not communicate or imply the quantity of buyers or investors in GWBS database for a particular type of business or any other business.

III.   IC shall not indicate to a client how many similar or related businesses have been in GWBS' database or their past results.

IV.   IC shall not state that any business valuation prepared or procured by GWBS is a certified audit.

V.    IC shall not influence the Client in any way regarding the "Asking Price" of "The Business."

VI.   IC shall not submit any order without the required paperwork.

VII.  IC shall not communicate that GWBS performs function other than the services described in the For Sale By Owner Advertising Agreement, Valuation Agreement, or Venture Capital Advertising Agreement.

VIII. IC shall not release the names of any existing or past clients unless expressly authorized by both client and GWBS.

IX.   IC shall not violate any other policy, procedure or amendment thereto that relates specifically to IC's duties and obligations under this Agreement.

<u>Dispute Resolution:</u> IC unequivocally consents and agrees that venue and jurisdiction over and aspect of the Agreement shall be in Dallas County, Texas. In addition, both GWBS and IC agree that any controversy or claim arising out of or relating to this contract, or the breach thereof, is subject to arbitration under the Federal Arbitration Act and shall be settled by binding arbitration to be conducted in Dallas, Texas and administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The costs of any arbitration shall be borne equally by the parties. A willful violation of this provision or any breach of this Agreement by Owner shall entitle GWBS to specific performance of this Agreement, to recover actual damages, to recover liquidated damages as stated herein and to receive reimbursement for GWBS' expenses and attorneys' fees incurred in securing enforcement herein.

<u>Insurance:</u> IC agrees at its sole cost and expense to obtain such policies of public liability insurance, fire and extended coverage insurance, worker's compensation insurance and such other forms of insurance as IC shall deem appropriate and in such limits as GWBS shall have the right to approve to fully insure IC, its Sub-Contractors, agents, servants, and employees from any of the insurable perils as described in said policies. Copies of any policies of insurance to be obtained by IC hereunder shall be furnished to GWBS not later than thirty (30) days from the date of execution of this Agreement.

<u>Notices:</u> All notice, offers, request, instructions, acceptance, consents, approvals and other communication required or authorized to be given by either party to the other under this Agreement shall be in writing, shall be addressed as indicated below, and shall be deemed to be received, whether actually received or not when deposited in the U.S. mail, postage prepaid, via registered or certified mail, return receipt requested, addressed to GWBS and IC as the case may be, as set forth below such parties' signatures hereto or at such other address as the parties may from time to time specify in writing.

<u>No Assignment:</u> The rights and duties of IC under this Agreement are personal and may not be assigned or delegated without prior written consent of GWBS, which consent may be withheld in the Company's sole and absolute discretion.

<u>No Agency:</u> IC is not authorized to extend any warranty or guarantee or to make representations or claims with respect to GWBS' services without express written authorization from GWBS.

<u>No other Legal Relationship:</u> This Agreement shall not create a partnership, joint venture, agency, employer-employee or similar relationship between GWBS and IC. IC shall not be considered a partner with GWBS and shall not be entitled to participate in any plan, arrangement or distribution by GWBS pertaining to or in connection with any pension, stock, bonus, profit sharing or other benefit extended to GWBS' employees.

<u>Injunctive Relief:</u> IC understands that any violation of this Agreement by IC, its Sub-Contractors or representatives will cause GWBS immediate and irreparable harm which money damages cannot adequately remedy. Therefore, upon any actual or impending violation of this Agreement, IC, its Sub-Contractors and representatives consent to the issuance of a restraining order, preliminary and/or permanent injunction, without bond, restraining or enjoining such violation by IC, its Sub-Contractors, or representatives. IC understands that such orders are additional to and do not limit the availability to GWBS or any other remedy.

**Damages Waiver**: In the event of a dispute in arbitration or litigation, GWBS and IC hereby waive, to the fullest extent permitted by law, any right to or claim of punitive or exemplary damages against the other and may recover only actual damages, attorneys' fees and liquidated damages as stated herein.

**Liquidated Damages**: In the event of a breach by IC of its obligations to provide Sales Services, its duties under the Confidentiality and Non-Competition Agreements or any other breach of this Agreement, it is hereby agreed that GWBS will incur certain damages, lost profits, and costs that are not readily ascertainable. Therefore, in the event of such a breach, IC shall pay to GWBS the liquidated damages as follows:

a.    For breach of its general obligations under this Agreement to provide Sales Services as defined herein, IC shall reimburse GWBS for the dollar for dollar value of GWBS' actual damages plus any fees, expenses, and costs incurred by GWBS in securing performance under this Agreement.

b.    For breach of its Confidentiality Agreement as defined herein, IC shall refund to GWBS all of the previous 7.5% commissions paid to IC for the Confidentiality Covenant from the date of execution of this contract until the date that GWBS first discovers the breach. In addition, IC shall be required to reimburse GWBS for any fees, expenses, and costs incurred by GWBS in securing performance under this Agreement.

c.    For breach of its Non-Competition Agreement as defined herein, IC shall refund to GWBS all of the previous 7.5% commissions paid to IC for the Non-Competition Covenant from the date of execution of this contract until the date that GWBS first discovers the breach. In addition, IC shall be required to reimburse GWBS for any fees, expenses, and costs incurred by GWBS in securing performance under this Agreement.

d.    GWBS and IC agree that the amounts established by this Paragraph as liquidated damages are reasonable under the circumstances existing at the time of the execution of this Agreement and that payment of said sum by IC shall exclude IC from any further liability under this Agreement.

**Waiver**: Any failure by GWBS to enforce and require the strict keeping and performance of any of the terms and conditions of this Agreement shall not constitute a waiver of any such terms and conditions at any future time and shall not prevent GWBS from insisting on the strict keeping and performance of such terms and conditions at any later time.

**Modifications to be in writing**: This Agreement shall not be modified or rescinded except by written instrument signed by authorized representative of both parties hereto.

**Copies of Agreement**:  This Agreement may be executed in two or more counterparts, each constitute one and the same instrument.

**Governing Law.**  The Terms and Conditions of this Agreement shall be construed pursuant to and in accordance with the laws of the state of Texas and all of the covenants and obligations hereunder are fully enforceable and performable in the City of Dallas, Dallas County, Texas.

**Venue**:   IC irrevocably consents and hereby agrees that any lawsuit relating to any matter arising under this Agreement shall be initiated in a State or Federal Court in the City of Dallas, Dallas County, Northern District of Texas, State of Texas, United States of America.

**Jurisdiction**:  IC irrevocably consents to the jurisdiction and to the service of process, pleading, and notices in connection with any and all actions and processes initiated in a State or Federal court located in the City of Dallas, Dallas County, Northern District of Texas, State of Texas, United States of America.

**Binding Effect and Benefit.**  This Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto and their respective successors and assigns in the event that said party is a corporation or said parties' respective heirs, executors, successors, assigns, and personal representatives in the event said party is an individual.

**Authority.**  Each party hereto represents and warrants to the other that the individual signing this document below has the full authority to bind the entity for which said individual is signing to the terms and conditions hereof and that this Agreement and the performance of the terms, conditions, and covenants hereof is fully authorized by and binding upon said entity.

**Partial Invalidity**:  In the event that any term or provision of this Agreement shall be deemed by a court of competent jurisdiction to be overly broad in scope, duration or area of applicability, such court shall have the power, and is hereby directed, to limit such scope, duration or area of applicability, or all of them, so that such term or provision is not overly broad, and to enforce the same as so limited. Subject to the foregoing sentence, in the event any provision